*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CO-523

UNITED STATES, APPELLANT,

v.

ZACKARY JACKSON, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-2512-15)

(Hon. Maribeth Raffinan, Trial Judge)

(Argued  October 26, 2016                     Decided  August 22, 2019)

*Nicholas P. Coleman*, Assistant United States Attorney, with whom *Channing D. Phillips*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Chrisellen R. Kolb*, *Alicia M. Long*, and *Anwar Graves*, Assistant United States Attorneys, were on the brief, for appellant.

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* and *Jaclyn Frankfurt*, Public Defender Service, were on the brief, for appellee.

Before BLACKBURNE-RIGSBY,[*] *Chief Judge*, GLICKMAN, *Associate Judge*, and WASHINGTON,[†] *Senior Judge*.

---

[*]  Chief Judge Blackburne-Rigsby was an Associate Judge at the time oral argument was held on October 26, 2016.  Judge Blackburne-Rigsby assumed the duties of Chief Judge on March 18, 2017.

GLICKMAN, *Associate Judge*: The United States appeals a pretrial order suppressing appellee Zackary Jackson's Global Positioning System (GPS) tracking data and derivative evidence in its prosecution of Mr. Jackson for armed robbery. The tracking data was collected and maintained by the District of Columbia Court Services and Offender Supervision Agency (CSOSA) after it required Mr. Jackson to wear a GPS tracking device on his ankle as a sanction for his having violated conditions of his probation in an earlier case. CSOSA gave the police access to the GPS data, and the data revealed to the police that Mr. Jackson was present at the scene of the armed robbery with which he is now charged. The police used the data to track Mr. Jackson from the location of the robbery to his home, where they arrested him and found tangible evidence linking him to the crime.

In moving to suppress the GPS data and its fruits, Mr. Jackson argued that CSOSA violated his Fourth Amendment rights by placing him on GPS monitoring for purposes of law enforcement without judicial authorization and that the police violated his Fourth Amendment rights by accessing the GPS tracking data without

---

*(…continued)*

† Senior Judge Pryor, who was assigned to this case originally and at the time of oral argument, retired on May 15, 2019. Senior Judge Washington was assigned to take his place on the division.

a search warrant. Addressing only the latter issue, the motions judge concluded that the police search infringed Mr. Jackson's reasonable expectation of privacy in his GPS data and, therefore, violated his Fourth Amendment rights.

We reverse. First, as a threshold matter, we hold that CSOSA's imposition of GPS monitoring on Mr. Jackson without judicial authorization was a constitutional "special needs" search; it was constitutional because his reasonable expectation of privacy as a convicted offender on probation was diminished and was outweighed by the strong governmental interests in effective probation supervision to deter and detect further criminal activity on his part and encourage his rehabilitation. We reject, as unsupported by the record, Mr. Jackson's claim that CSOSA placed him on GPS monitoring as a subterfuge to enable the police to avoid having to comply with the warrant and probable cause requirements of the Fourth Amendment. Second, we conclude that Mr. Jackson had no objectively reasonable expectation that CSOSA would withhold the GPS tracking data from the police. The limited police examination of that data—which focused solely on determining whether any monitored CSOSA supervisee was present during the armed robbery (and if so, where that supervisee went immediately afterwards)—therefore did not violate Mr. Jackson's Fourth Amendment rights.

## I.

### A. Mr. Jackson's Placement on GPS Monitoring

On December 13, 2013, Mr. Jackson pleaded guilty in Superior Court to one count of attempted robbery. Mr. Jackson had been charged with armed robbery. In tendering his guilty plea to the lesser offense, he admitted that he and two accomplices put on masks inside the Benning Road Metro station and robbed the victim of his cell phone by threatening him with a BB pistol.

Three months later, the judge sentenced Mr. Jackson to twelve months' incarceration, with all but four months suspended in favor of one year of probation under the supervision of CSOSA. The court-imposed conditions of his probation included requirements that Mr. Jackson (1) "[o]bey all laws, ordinances, and regulations"; (2) permit his Community Supervision Officer [CSO] to visit his place of residence; (3) report to all scheduled appointments with his CSO; (4) notify his CSO within one business day of any arrest or questioning by a law enforcement officer; (5) submit to drug testing at the discretion of CSOSA; (6) participate in and complete CSOSA programs as directed; and (7) "[i]n the event of illicit drug use or other violation of conditions of probation, participate as directed

by [his] CSO in a program of graduated sanctions that may include periods of residential placement or services."

Mr. Jackson's period of probation began in July 2014. It did not go well. Mr. Jackson failed to report for scheduled appointments with his CSO on five occasions, in August, December, and January; he did not pursue gainful employment as required by CSOSA programming; and on December 23, 2014, Mr. Jackson was re-arrested in Virginia.[1]

Thereafter, in January 2015, a detective with the Metropolitan Police Department (MPD) contacted CSOSA to request that Mr. Jackson be placed on GPS monitoring, one of the options in CSOSA's program of graduated sanctions for non-compliant behavior. As stated in CSOSA's internal emails, the detective made this request because the police believed Mr. Jackson and another named individual "may" have been committing robberies and burglaries together at a

---

[1] According to CSOSA's running record of Mr. Jackson's supervision, he was released following his new arrest and was due back in court the following month. In the hearing below on the evidence suppression motion, counsel for the United States represented that Mr. Jackson was arrested in Virginia for "a felony pickpocket." The record on appeal does not appear to provide any additional information about the nature of the charge in Virginia or the outcome of the proceedings there.

particular Metro station in the District and elsewhere. The police request triggered a review by CSOSA of Mr. Jackson's compliance with his terms of probation to determine whether he met the agency's criteria for GPS monitoring. Citing Mr. Jackson's re-arrest, lack of employment, and failure to look for work and participate in CSOSA programming, the agency decided he should be placed on GPS monitoring "immediately."[2]

Mr. Jackson's CSO met with him on January 28, 2015. She questioned him about his missed appointments and his involvement in criminal activity (which he denied), and she informed him that he would be placed on GPS monitoring. According to her record of the meeting, Mr. Jackson was "visibly upset" by that decision and "stated he wouldn't be able to do anything." The CSO emphasized

---

[2] CSOSA's published Policy Statement 4008, "Global Positioning System (GPS) Tracking of Offenders," effective May 7, 2009, https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2018/03/4008_gps_tracking_050709.pdf (last visited June 13, 2019), sets forth the procedures CSOSA follows in connection with the imposition of GPS tracking of offenders. The Policy Statement provides that an offender under supervision may be referred for placement on GPS as a sanction if, among other things, the offender is re-arrested and released into the community pending further judicial action, or if the offender is unemployed, at a maximum or intensive level of supervision, and not actively searching for employment or in school or a training program.

that although Mr. Jackson would not have a curfew, "he must be aware that [CSOSA] will be tracking his whereabouts for at least 30 days."[3]

The next day, Mr. Jackson reported to CSOSA for the GPS device – a small bracelet transmitter with a strap – to be fitted and attached to his ankle. He signed a "CSOSA Global Positioning System (GPS) Contract," in which he acknowledged his understanding that "all GPS activities will be monitored by CSOSA's (24/7) Monitoring Center," and that "all movement will be tracked and stored as an official record." The contract required Mr. Jackson to wear the GPS device at all times and not to tamper with it for any reason. It also required him to charge the device twice a day, an hour in the morning and an hour in the evening, and not to sleep while the device was charging. The contract stated that the device was waterproof and did not prevent him from taking showers, but that he should not submerge the device in water (meaning he could not bathe or swim while wearing it).

---

[3] CSOSA's Policy Statement on GPS tracking of supervised offenders, *supra*, footnote 2, provides that when GPS tracking is employed as a sanction for non-compliant behavior, it may be implemented for up to thirty days and, when aggravating circumstances exist, extended for up to a total of ninety days.

## B. An Armed Robbery and Its Investigation

Early on the morning of February 19, 2015 (less than three weeks after Mr. Jackson began wearing the GPS device), police received a report of an armed robbery in the 4400 block of C Street in Southeast Washington, D.C. As the victims, Mr. Parker and Ms. Pleasant, described the incident, they were walking home together and, after turning from Texas Avenue onto C Street, they passed by an alley on their left. In the alley, they noticed a newer model black SUV that pulled out and drove toward the intersection of Texas Avenue and C Street. Mr. Parker looked back and saw the SUV pause at the traffic light there. Ms. Pleasant asked him what time it was, and Mr. Parker checked his cell phone and told her it was 1:36 a.m.

As he put the cell phone back in his pocket, Mr. Parker looked back again and saw the SUV speeding toward him and Ms. Pleasant in reverse. The SUV stopped right in front of them. Two men got out of the back seats. One displayed a small, black handgun and took Mr. Parker's wallet. The other man took Ms. Pleasant's purse. The two men then returned to the SUV, which drove off toward Texas Avenue. The two victims got home and called the police.

Detective Thomas O'Donnell of the MPD interviewed the complainants shortly after they reported the robbery. Although they provided detailed physical descriptions of their assailants, the robbers' identities were unknown and there were no suspects or other witnesses. Detective O'Donnell decided to run a check to determine whether any supervisees under GPS monitoring by CSOSA were at the crime scene at the time of the offense. He had access to the computerized GPS tracking data pursuant to a Memorandum of Understanding in which CSOSA agreed to share it with the MPD and allowed the police to query the database directly.[4] The monitoring system tracks and records the movements of the GPS devices in one-minute increments, twenty-four hours a day, seven days a week. Detective O'Donnell entered the coordinates of the crime scene into the database to determine whether any monitored supervisees were in the area between 1:20 a.m. to 1:45 a.m.

His GPS check produced two hits. It revealed that Mr. Jackson and another CSOSA supervisee were in the alley where the victims saw the SUV just before the robbery occurred. From the alley, their movements conformed to the victims' observations of their attackers: the GPS data showed that Mr. Jackson and the

---

[4] We describe this sharing arrangement further in Part II.B of this opinion.

second person moved toward the intersection of Texas Avenue and C Street, then went back into the 4400 block of C Street, and then went back to Texas Avenue. The GPS data also allowed the police to track the two suspects' subsequent movements as they briefly separated and then reunited in the rear parking lot of 4410 E Street, Southeast. The data showed that Mr. Jackson then went into an apartment at 4410 E Street and that the other suspect went to a location a block away.

The police immediately went to the two destinations. They arrived at Mr. Jackson's apartment building between 2:00 and 3:00 a.m. Mr. Jackson's GPS device continued to show him as being there. In the rear parking lot, the officers saw a black, newer model SUV. Mr. Parker, who accompanied Detective O'Donnell, identified the SUV as the one the robbers used.[5] On the ground near the stairs leading to the building entrance, the police found a bank card in Mr. Parker's name.

The police proceeded to Mr. Jackson's apartment to arrest him and secure the location while they applied for a warrant to search it. In the apartment, they

---

[5] WALES and NCIC checks indicated that the SUV had been stolen.

found Mr. Jackson with three other people. After obtaining the search warrant, the police recovered the keys to the SUV and some items that may have been in Ms. Pleasant's purse.[6]

Mr. Jackson was arrested. He subsequently was charged by indictment with two counts of armed robbery, first-degree theft (of the SUV), and unauthorized use of a vehicle (the SUV) to facilitate a crime of violence.

### C. The Trial Court's Suppression of the Evidence

Following his arraignment, Mr. Jackson moved to suppress the electronic and tangible evidence linking him to the robberies. Among his claims, he argued that his Fourth Amendment rights were violated by CSOSA's imposition of GPS monitoring at the behest of the police and by the subsequent warrantless police search of the GPS tracking data. After a hearing, and on largely undisputed facts, the motions judge granted the motion to suppress on the latter ground, that the police search of the GPS data was unconstitutional. The judge did not address the constitutionality of CSOSA's GPS monitoring of Mr. Jackson.

---

[6] The police also searched the second suspect's residence. They reportedly found him in a downstairs bedroom, lying on top of a cell phone that matched the description of the phone in Ms. Pleasant's stolen purse.

The judge based her ruling on her conclusion that Mr. Jackson reasonably expected that the police would not have access to his GPS tracking data. In reaching that conclusion, the judge acknowledged that Mr. Jackson was on probation and that, "[g]iven the language of the GPS Contract, it would be unreasonable for Jackson to expect privacy in his GPS location information *as to CSOSA*." (Emphasis added.) However, the judge noted, the conditions of Mr. Jackson's probation and his GPS Contract did not inform him, "clear[ly] and unambiguous[ly]," that the location data would be shared with or accessible to *the police*. Absent such notification, the judge stated, Mr. Jackson "could not have reasonably foreseen that the MPD would have unfettered, unilateral access to his location information for developing suspects and finding witnesses in criminal cases." Because the police lacked "any level of individualized suspicion" linking Mr. Jackson to the robberies before they queried the GPS database, the judge concluded that Mr. Jackson's undiminished expectation of privacy vis-à-vis the police outweighed "the MPD's general interest in criminal investigation." Accordingly, the judge held, the police search of Mr. Jackson's GPS location data was "unreasonable under the Fourth Amendment."

## II.

Two distinct Fourth Amendment issues are presented in this appeal. Given the undisputed factual record before us, each turns on legal questions that we decide *de novo*. The first is whether CSOSA violated Mr. Jackson's Fourth Amendment rights by placing him on GPS monitoring without judicial approval. This issue turns, as we shall explain, on whether the monitoring was justified as a reasonable intrusion on Mr. Jackson's privacy to meet the "special needs" of probation supervision. We address this legal issue, even though the motions judge granted suppression for other reasons, because it was litigated in the proceedings below, Mr. Jackson continues to urge it on appeal as an alternative ground for affirmance, and the United States has had a full and fair opportunity to rebut the claim.[7] Moreover, our resolution of the second Fourth Amendment issue before us depends on our answer to the first issue.

The second issue is whether the police conducted an unconstitutional search when, without having a search warrant or individualized suspicion, they queried CSOSA's GPS database and acquired the information it contained about Mr.

---

[7] *See Ibn-Tamas v. United States*, 407 A.2d 626, 635-36 (D.C. 1979).

Jackson's location and movements at the time and in the immediate vicinity of the robbery. Assuming the lawfulness of CSOSA's acquisition of that information in the first place, this issue turns in our view on whether CSOSA violated Mr. Jackson's reasonable expectation of privacy by allowing the police to access its GPS database for the limited use the police made of it.

We address these two issues in turn.[8]

---

[8]   In the proceedings below, the United States argued that CSOSA's imposition of GPS monitoring did not violate Mr. Jackson's Fourth Amendment rights because he consented to it when he agreed to the GPS contract. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Mr. Jackson disputed that claim, arguing that his mere acquiescence to the monitoring did not amount to a valid waiver of his Fourth Amendment rights. The motions judge did not address this issue of consent in her decision, and while the United States does not concede the issue, it has not pressed the consent argument on appeal. We do not find it necessary to reach the question; to quote the Second Circuit's observation in a similar case, "[t]he issue here … is not so much whether [Mr. Jackson] gave consent as it is whether he had a reasonable and legitimate expectation of privacy." *United States v. Lambus*, 897 F.3d 368, 410 (2d Cir. 2018); *see also United States v. Knights*, 534 U.S. 112, 118 (2001) (refraining from deciding whether probationer's acceptance of a search condition "constituted consent in the *Schneckloth* sense of a complete waiver of his Fourth Amendment rights," because the Court could conclude that the search "was reasonable under our general Fourth Amendment approach of 'examining the totality of the circumstances,' . . . with the probation search condition being a salient circumstance" (internal citation omitted)).

**A.  CSOSA Did Not Violate Mr. Jackson's Fourth Amendment Rights by Placing Him on GPS Monitoring and Tracking His Movements.**

**1.  The Special Needs of Probation Supervision Recognized in** *Griffin v. Wisconsin*

It is common ground that when the government "attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements," it conducts a search subject to the Constitution's requirements.[9]  The government's use of the device to monitor the person's movements also constitutes a search for Fourth Amendment purposes.[10]

The Fourth Amendment to the Constitution protects the right of the people to be secure against searches and seizures that are "unreasonable."[11]  Thus, as "[t]he touchstone of the Fourth Amendment is reasonableness,"[12] the central question before us is the reasonableness *vel non* of CSOSA's GPS monitoring of Mr. Jackson.  Resolution of this question "depends on the totality of the circumstances, including the nature and purpose of the search and the extent to

---

[9]  *Grady v. North Carolina*, 135 S.Ct. 1368, 1370 (2015).

[10]  *See United States v. Jones*, 565 U.S. 400, 404 (2012).

[11]  U.S. Const. amend. IV.

[12]  *Knights*, 534 U.S. at 118.

which the search intrudes upon reasonable privacy expectations."[13]  We determine whether a search is reasonable "by assessing, on the one hand, the degree to which it intrudes upon an individual's [reasonable expectation of] privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests."[14]  The Supreme Court has characterized this as a balancing test.[15]

"Where a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, . . . reasonableness generally requires the obtaining of a judicial warrant" upon the showing of probable cause required by the Fourth Amendment's Warrant Clause.[16]  But the Court has explained that:

---

[13] *Grady*, 135 S.Ct. at 1371.

[14] *Knights*, 534 U.S. at 118-19 (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

[15] *See, e.g.*, *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652-53 (1995) ("At least in a case such as this, where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'" (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 619 (1989))).

[16] *Acton*, 515 U.S. at 653.

> [A] warrant is not required to establish the reasonableness of all government searches; and when a warrant is not required (and the Warrant Clause therefore not applicable), probable cause is not invariably required either. A search unsupported by probable cause can be constitutional . . . "when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable."[17]

Nor do searches motivated by "special needs, beyond the normal need for law enforcement" necessarily require a degree of "individualized suspicion of wrongdoing" in the absence of probable cause; "the Fourth Amendment imposes no irreducible requirement of such suspicion."[18]

In *Griffin v. Wisconsin*, the Supreme Court considered whether the operation of a probation system presents "special needs" beyond the normal need for law enforcement that may justify exempting supervisory searches of probationers from

---

[17] *Id.* (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987)).

[18] *Id.* (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 560-61 (1976)). The Court has upheld suspicionless searches and seizures under "special needs" or similar rationales in a variety of situations – for instance, in *Acton*, 515 U.S. at 653-65 (upholding random urinalysis drug testing of students in school athletics programs; *Skinner*, 489 U.S. at 633-34 (drug testing of railroad personnel involved in train accidents); *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 666, 676 (1989) (drug tests for U.S. Customs Service employees seeking transfers or promotions); *New York v. Burger*, 482 U.S. 691, 702-04 (1987) (warrantless administrative inspections of the premises of "closely regulated" businesses).

the requirements the Fourth Amendment imposes on "normal" law enforcement searches. The question arises, even though both types of searches aim to discover evidence of criminal activity, because supervisory searches of probationers are unlike "normal" law enforcement searches in that they are conducted as part of the distinctive probation mission to reform convicted offenders and deter them from committing new crimes. The Court was persuaded in *Griffin* of the significance of this contextual difference, and it applied the "special needs" rationale to uphold a warrantless search of a probationer's home under circumstances parallel, in important respects, to those in this case.

The facts of *Griffin* were as follows. Under Wisconsin law, probationers were subject to the conditions of probation set by the court at sentencing and to the regulations of the probation department. One such regulation allowed any probation officer to search any probationer's home, without a warrant or other prior judicial approval, so long as there were "reasonable grounds" to believe

contraband was present in the home.[19]  This home-search authorization was not one of the court-imposed conditions of Griffin's probation.[20]

While Griffin was on probation, the probation office received information from a police detective that "there were or might be guns" in Griffin's apartment.[21] Two probation officers, accompanied by three police officers, went there to find out.  Relying on the home-search regulation, they did not apply for a search warrant.  When Griffin opened the door, one of the probation officers "informed him that they were going to search his home."[22]  They found and seized a handgun. Griffin was prosecuted for felony possession of a firearm.  He moved to suppress the handgun, arguing that the probation officers' search of his home without a

---

[19]  *Griffin*, 483 U.S. at 871; *see also Knights*, 534 U.S. at 117 ("The regulation applied to all Wisconsin probationers, with no need for a judge to make an individualized determination that the probationer's conviction justified the need for warrantless searches.").

[20]  In fact, the regulation was not promulgated until a year after Griffin was sentenced and placed on probation. *See Knights*, 534 U.S. at 117 & 117 n.2 (citing *Griffin*, 483 U.S. at 870, 871).

[21]  *Griffin*, 483 U.S. at 871.  The Court considered it "most unlikely" that this "unauthenticated tip of a police officer – bearing, as far as the record shows, no indication whether its basis was firsthand knowledge or, if not, whether the firsthand source was reliable, and merely stating that Griffin 'had or might have' guns in his residence, not that he certainly had them – would meet the ordinary requirement of probable cause." *Id.* at 878.

[22]  *Id.*

warrant violated the Fourth Amendment. The court denied the motion and Griffin was convicted.

The Supreme Court held that "[t]he search of Griffin's home satisfied the demands of the Fourth Amendment because it was carried out pursuant to a regulation that itself satisfies the Fourth Amendment's reasonableness requirement" under the "well-established" exception to the warrant requirement for "special needs" searches.[23] The Court explained its holding as follows. First, it perceived it to be "always true of probationers . . . that they do not enjoy 'the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions'" – restrictions "meant to assure that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large."[24] "These same goals," the Court stated, "require and justify the exercise of supervision to assure that the restrictions are in fact observed."[25] Moreover, the Court noted, "[r]ecent research suggests that more intensive supervision can reduce

---

[23] *Id.* at 873.

[24] *Id.* at 874-75 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)).

[25] *Id.* at 875.

recidivism, . . . and the importance of supervision has grown as probation has become an increasingly common sentence for those convicted of serious crimes."[26] In light of these considerations, the Court concluded that probation supervision "is a 'special need' of the State permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large."[27]

Second, the Court found multiple reasons to conclude that the special needs of probation supervision make the usual warrant and probable-cause requirements of the Fourth Amendment impracticable. It stated:

> A warrant requirement would interfere to an appreciable degree with the probation system, setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires. Moreover, the delay inherent in obtaining a warrant would make it more difficult for probation officials to respond quickly to evidence of misconduct, and would reduce the deterrent effect that the possibility of expeditious searches would otherwise create. . . . And on the other side of the equation—the effect of dispensing with a warrant upon the probationer: Although a probation officer is not an impartial magistrate, neither is he the police officer who normally conducts searches against

---

[26] *Id.*

[27] *Id.*; *see also Ferguson v. City of Charleston*, 532 U.S. 67, 79 n.15 (2001) ("*Griffin* is properly read as limited by the fact that probationers have a lesser expectation of privacy than the public at large.").

> the ordinary citizen. He is an employee of the [state probation department] who, while assuredly charged with protecting the public interest, is also supposed to have in mind the welfare of the probationer . . . . In such a setting, we think it reasonable to dispense with the warrant requirement.[28]

The Court also concluded that probation supervision would be "unduly disrupted" by a requirement that there be probable cause to search the probationer's home, among other reasons because (1) such a requirement "would reduce the deterrent effect of the supervisory arrangement;" (2) "the probation agency must be able to act based upon a lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does damage to himself or society;" and (3) "it is the very assumption of the institution of probation that the probationer is in need of rehabilitation and is more likely than the ordinary citizen to violate the law."[29]

In sum, under the "special needs" analysis of *Griffin*, the Fourth Amendment permits probation supervision to intrude significantly on probationers' privacy without judicial approval or probable cause in order to determine whether they are

---

[28] *Griffin*, 483 U.S. at 876-77.

[29] *Id.* at 878-80; *see also Knights*, 534 U.S. at 120 ("The recidivism rate of probationers is significantly higher than the general crime rate.").

abiding by the law and the conditions of their probation, because probationers' reasonable privacy expectations are diminished and are outweighed by the heightened governmental interests in deterring them from re-offending and promoting their rehabilitation.[30]

### 2. CSOSA's Special Need to Use GPS Monitoring as an Administrative Sanction for High-Risk Supervisees

*Griffin*'s "special needs" analysis applies to CSOSA's installation of a GPS device on Mr. Jackson's ankle to monitor his movements. CSOSA is the counterpart in the District to the state probation department in *Griffin*. It is a federal agency charged by law with providing "supervision, through qualified supervision officers, for offenders on probation, parole, and supervised release pursuant to the District of Columbia Official Code."[31]

---

[30] *See also Samson v. California*, 547 U.S. 843, 853 (2006) ("[A] State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment." (citing *Griffin*, 483 U.S. at 879; *Knights*, 534 U.S. at 121)).

[31] D.C. Code § 24-133(c)(1) (2012 Repl. & 2018 Cum. Supp.); *see Hunt v. United States*, 109 A.3d 620, 621 (D.C. 2014).

To carry out that charge, CSOSA was directed by law to "[d]evelop and operate intermediate sanctions" for probationers and other sentenced offenders under its supervision.[32] The regulations that CSOSA promulgated to that end are the counterpart to the regulation at issue in *Griffin*.[33] They provide that if a Community Supervision Officer (CSO) has "reason to believe" a supervisee is "failing to abide by the general or specific conditions of release" or is "engaging in criminal activity," the CSO may address the problem by imposing one or more administrative sanctions.[34] We explained the advantages of this option in *Hunt* as follows:

> Sanctions "can be applied short of court or USPC [Parole Commission] approval" and enable CSOSA to "provide swift, certain, and consistent responses to noncompliant behavior." . . . "Imposing the sanctions quickly and consistently may prevent escalation of the offender's non-compliant behavior." . . . [B]y issuing sanctions, CSOSA "introduce[s] an accountability structure into the supervision process" without commencing revocation proceedings or seeking a hearing for a change in release conditions."[35]

---

[32] D.C. Code § 24-133(b)(2)(F).

[33] *See* 28 C.F.R. § 810.3 (2003).

[34] *Id.* at § 810.3(a).

[35] *Hunt*, 109 A.3d at 621-22 (quoting Community Supervision: Administrative Sanctions, 68 Fed. Reg. 19738-01 (Apr. 22, 2003)).

These advantages echo *Griffin*'s concerns that requiring a warrant would "interfere to an appreciable degree with the probation system," "make it difficult for probation officials to respond quickly to evidence of misconduct," and "reduce the deterrent effect that the possibility of expeditious searches would otherwise create."[36]

The administrative sanctions available to the CSO include "[e]lectronic monitoring for a specified period of time."[37]  This is the provision under which CSOSA utilizes GPS tracking technology.  Like the other enumerated sanctions, GPS tracking is intrusive, but it directly serves the primary purposes of probation supervision.  As was proffered to the motions judge in the proceedings below, CSOSA's website publicized and explained its use of GPS monitoring of its highest-risk offenders for these purposes as follows:

> CSOSA uses Global Positioning System (GPS) satellite
> monitoring for the highest-risk offenders as part of a
> series of graduated sanctions or as a special condition

---

[36]  *Griffin*, 483 U.S. at 876.

[37]  28 C.F.R. § 810.3(b)(6).  Other authorized administrative sanctions listed in § 810.3(b) include daily check-ins, increased drug testing and drug abuse assessments, community service and increased group activities, placement in a residential sanctions facility or residential treatment facility, and restrictions on travel.

imposed by the releasing authority. GPS monitoring is used to enforce curfews, establish prohibited/restricted areas, and assess and monitor offender movement in the community. Depending on the type of GPS technology employed with a particular offender, monitoring can be performed on an almost real-time basis.

\* \* \*

This effective tool allows CSOSA to provide heightened supervision of high-risk offenders while allowing such offenders to productively rehabilitate in the community.

On any given day, at least 100 offenders are on GPS monitoring. . . . GPS placements typically last between 14 and 90 days.

CSOSA staff work daily with the DC Metropolitan Police Department (MPD) and other law enforcement agencies to match offender GPS coordinates with crime locations. Mapping technology allows CSOSA to create extremely detailed maps of locations and offender movements to aid in suspect apprehension and identification of witnesses. CSOSA has trained and provided MPD staff with direct access to the GPS system for monitoring purposes. MPD's Intelligence Fusion Division, responsible for the collection, analysis, and dissemination of information related to violent crimes within the District of Columbia, is a regular user of CSOSA's GPS data.[38]

---

[38] "Electronic Monitoring, Court Services and Offender Supervision Agency for the District of Columbia" (May 5, 2016), http://www.csosa.gov/supervision/accountability/monitoring.aspx. This page was available on the website when Mr. Jackson was placed on probation and being monitored. Although the page has since been removed, similar information is now available on CSOSA's website in its May 7, 2009, Policy Statement 4008; see

*(continued…)*

### 3. The Reasonableness of CSOSA's Placement of Mr. Jackson on GPS Monitoring

While probation supervision "is a 'special need' . . . permitting a degree of impingement upon privacy that would not be constitutional if applied to the public at large[,] [t]hat permissible degree is not unlimited."[39] The "impingement" upheld in *Griffin* was a warrantless "special needs" search of a probationer's home, as authorized by the probation department's regulations, based on reasonable grounds to suspect the presence there of contraband. In this case, the "impingement" was the warrantless attachment and use of a GPS tracking device, as authorized by CSOSA's regulations, based on reasonable grounds to suspect a probationer might be committing new crimes. (Mr. Jackson was not subject to a curfew or a stay-away order.) The Fourth Amendment reasonableness inquiry requires us to weigh the extent to which such a search violates a probationer's reasonable privacy

---

*(…continued)*

footnote 2, *supra*. We note that, regardless of the utilization of CSOSA's GPS data by the police, the Policy Statement provides that CSOs are responsible for reviewing the GPS tracks of offenders under their supervision on a daily basis, and for investigating, reporting, and sanctioning any violations.

We address the propriety of CSOSA's sharing of its GPS data with the MPD in Part II.B of this opinion.

[39] *Griffin*, 483 U.S. at 875.

expectations against CSOSA's special need to be able to impose such a sanction to supervise noncompliant, high-risk probationers.

We begin by acknowledging that GPS monitoring can be a serious intrusion on personal privacy. Attachment of the GPS device is a trespass on the probationer's person. Having to maintain the device is a chore that somewhat curtails the probationer's activities and freedom of movement. Mr. Jackson's GPS contract, for example, did not allow him to bathe or go swimming, and it required him to be inactive for two hours every day while charging the device. Beyond that, the Supreme Court has recognized that "individuals have a reasonable expectation of privacy *in the whole* of their physical movements," including those in the public domain.[40] Activities carried on in public are not private by definition and, generally speaking, no reasonable expectation of privacy attends them; but the government's prolonged, minute-by-minute tracking and recording of all of a person's movements and whereabouts is another matter.[41] Such intensive

---

[40] *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (emphasis added).

[41] *See Jones*, 565 U.S. at 430 (Alito, J., joined by three other Justices, concurring in the judgment) ("[R]elatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable. But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.").

surveillance is unusual and, under normal circumstances, is contrary to the ordinary person's privacy expectations because it has *the potential* to open "an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"[42]

It also must be acknowledged, however, that "nothing of that kind is involved in this case."[43] By itself, CSOSA's GPS monitoring "just identifies locations; it doesn't reveal what the wearer of the device is doing at any of the locations."[44] So far as appears, CSOSA follows internal procedures to ensure that GPS monitoring is appropriate, and the tracking data is reviewed solely to determine whether supervisees were present at crime scenes or prohibited locations, or were violating curfews. When confined to that use, GPS monitoring

---

[42] *Carpenter*, 138 S. Ct. at 2217 (quoting *Jones*, 565 U.S. at 415 (opinion of Sotomayor, J.)).

[43] *Belleau v. Wall*, 811 F.3d 929, 935 (7th Cir. 2016) (upholding constitutionality of statute requiring persons released from civil commitment for sex offenses to wear a GPS monitoring device 24 hours a day for the rest of their lives).

[44] *Id.* at 936.

is far less of an intrusion on a supervisee's privacy than, for example, the warrantless search of a private home sanctioned in *Griffin*.[45]

As the Supreme Court emphasized in *Griffin* and subsequent cases, the reasonable privacy expectations of a probationer are not the same as those enjoyed by the ordinary citizen; an offender under precautionary and rehabilitative supervision on release in lieu of incarceration must expect considerable supervisory intrusion on his privacy. Offenders placed on probation in Superior Court are informed of what kinds of intrusions to expect. The conditions of Mr. Jackson's probation warned him that he would have to accept (among other requirements) home visits by his CSO, drug testing at CSOSA's discretion, and – of particular pertinence to this case – the "program of graduated sanctions" to which his conduct on probation might subject him. CSOSA's regulations and procedures require offenders to enter into "accountability contracts" at the outset of their probation, in which they expressly acknowledge their probation responsibilities and the specified administrative sanctions, including GPS monitoring, to which they will be subject for violating the conditions of their

---

[45] *See Payton v. New York*, 445 U.S. 573, 585 (1980) ("[T]he 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." (internal quotation marks omitted)).

supervision.[46]  Thus, probationers like Mr. Jackson are on notice and agree that they will be subject to intensive and intrusive supervision, specifically including GPS monitoring, if there is reason to believe they are engaging in criminal activity while on probation or otherwise violating the conditions of their release.[47]  Mr. Jackson's subsequent, albeit reluctant, acceptance of his GPS monitoring contract manifested his awareness that his supervision could include such an intrusion and thereby confirmed his "severely diminished expectation of privacy" with respect to such monitoring.[48]

CSOSA's *disclosed* use of electronic monitoring is calculated to be less invasive of the probationer's privacy than prolonged secret surveillance would be.

---

[46]  *See* 28 C.F.R. 810.2 (c); Policy Statement 4004, effective November 8, 2006, "Accountability Contract," https://www.csosa.gov/wp-content/uploads/bsk-pdf-manager/2018/03/4004_accountability_contract_110806.pdf (last visited June 13, 2019).

[47]  Mr. Jackson's accountability contract is not included in the record before us, however.

[48]  *United States v. Newton*, 369 F.3d 659, 665 (2d Cir. 2004) (quoting *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002)); *see also Samson*, 547 U.S. at 852 ("In *Knights*, we found that acceptance of a clear and unambiguous search condition 'significantly diminished Knights' reasonable expectation of privacy.'" (quoting *Knights*, 534 U.S. at 120)); *United States v. Lambus*, 897 F.3d 368, 410 (2d Cir. 2018) (supervisee's signing of GPS monitoring agreement "is inconsistent with either a legitimate or a reasonable expectation of privacy protecting him from constant search via GPS").

The probationer's awareness that his movements will be tracked for a limited period of time makes it less likely that the surveillance will be utilized for improper purposes or otherwise abused. Knowledge of the monitoring enables the probationer to exercise some control over how much of his personal life is potentially exposed, and to apply to the court for relief if he believes the monitoring is unjustified, excessive, or otherwise objectionable. Mr. Jackson could have exercised the option of applying to the court for relief from the monitoring had he wished to do so.[49] Alternatively, Mr. Jackson could have refused to accept installation of the GPS device, in which case CSOSA would have presented the issue to the court itself by moving to revoke or amend Mr. Jackson's probation.

The infringement on Mr. Jackson's reasonable privacy expectations must be balanced against CSOSA's legitimate supervisory needs in his case and the extent to which the imposition of GPS monitoring promotes the governmental interests in deterring recidivism and encouraging Mr. Jackson's reformation. This side of the ledger weighs heavily in favor of the search's reasonableness. CSOSA's criteria

---

[49] *See* D.C. Code § 24-304 (a) (2012 Repl. & 2018 Cum. Supp.) ("At any time during the probationary term the court may modify the terms and conditions of the order of probation, . . . when in the opinion of the court the ends of justice shall require . . . .").

for placement of supervisees on GPS tracking reasonably limit its use to high-risk offenders whose behavior under less intensive supervision demonstrably supports the need to monitor them more closely. CSOSA reasonably determined that Mr. Jackson met those criteria, as he was on probation for a robbery, he had been re-arrested (apparently for another robbery), and he had not been complying with his supervisory conditions. CSOSA had ample reason to deem him at high risk of re-offending with another violent felony and to find it appropriate to institute GPS tracking of his movements to deter him. It cannot plausibly be maintained that the intrusion of GPS tracking was disproportionate to the threat Mr. Jackson posed to the safety of the community.

Mr. Jackson's objection, that CSOSA put him on GPS monitoring at the urging of the police because they suspected him of continuing to commit robberies, is not well taken. Even if CSOSA's decision was influenced by that information and request, *Griffin* deemed it "reasonable to permit information provided by a police officer . . . to support a probationer search,"[50] and it is well-settled that probation officers are permitted to collaborate with the police "as long as the probation officers are pursuing legitimate probation-related objectives" in doing

---

[50] 483 U.S. at 879-80.

so.[51]  Here, while the police request was evidently what led CSOSA to *consider* placing Mr. Jackson on GPS monitoring, the record shows that CSOSA did so only after determining that he met its own criteria for employing GPS monitoring to further the objectives of his probation supervision.

In addition, the record before us lends no support to Mr. Jackson's assertion that CSOSA put him on GPS monitoring so that the police could "use that surveillance for the purpose of its robbery investigation."[52] There is no evidence that CSOSA informed the police it had begun tracking Mr. Jackson's movements, and no evidence that the police used his GPS surveillance to investigate his potential involvement in robberies other than the one at hand.  In the present case, of course, Mr. Jackson was not initially identified as a suspect and Detective O'Donnell's initial query of the GPS database did not target him at all; the police simply entered the coordinates of the reported robbery and inquired whether anyone monitored by CSOSA had been at the scene.

As the facts of this case illustrate, GPS tracking is a uniquely valuable and effective tool for detecting whether a high-risk offender is committing crimes,

[51]  *Reyes*, 283 F.3d at 464 (citing cases).

[52]  Brief for Appellee at 29 n.18.

going to prohibited places, or violating curfew, and—because the inquiry of the data can be and is selectively limited to those questions—for doing so *without* unnecessarily intruding into the offender's other activities at all. For the reasons identified in *Griffin* and *Hunt*, CSOSA's ability to employ such focused GPS monitoring as an intermediate sanction without judicial approval promotes legitimate governmental interests in responsive, effective, and commensurate supervision of high-risk offenders on probation. As this court recognized in *Hunt*, "sanctions are an *alternative* to requesting a hearing that 'may result in . . . changes to the conditions of [a probationer's] release.'"[53]  Like the Supreme Court in *Griffin*, we think little if anything would be gained in most cases by "setting up a magistrate rather than the probation officer as the judge of how close a supervision the probationer requires" from time to time.[54]  It is telling that, in the present case, although Mr. Jackson complains that CSOSA did not seek judicial approval of its decision to put him on GPS monitoring, he has not argued that the decision was unjustified by his behavior on probation, nor has he identified any reason a judge might have disagreed with it in his case. As we have said, judicial review of a

---

[53]  109 A.3d at 623 (quoting 28 C.F.R. § 810.3(a) (2014)).

[54]  483 U.S. at 876.

questionable decision to initiate GPS monitoring is available to a probationer. Mr. Jackson did not seek such review.

Although a court may have reason in some cases to make compliance with GPS monitoring an express condition of probation at the time the court imposes sentence, such an express condition is not a constitutional prerequisite for the probationer to be subjected to a monitoring requirement if his behavior on probation calls for it as a reasonable sanction.[55] The need for a GPS monitoring requirement is not something that can be predicted accurately at the time of sentencing; unanticipated circumstances may arise and justify CSOSA's employment of that tool as an intermediate and hopefully temporary sanction.

In our view, the limited nature and degree of the intrusion by GPS monitoring on Mr. Jackson's privacy was outweighed by the extent to which that intrusion was needed to promote the government's legitimate and important interests in the effective supervision of a high-risk probationer. Like the Supreme Court in *Griffin*, we therefore conclude that CSOSA's placement of Mr. Jackson on GPS monitoring pursuant to its regulations governing probationers was a

---

[55] In *Griffin*, for example, the Court upheld the warrantless search of a probationer's home even though no condition of probation authorized it.

reasonable search within the meaning of the Fourth Amendment. It is on this premise that we now turn to consider the ruling that the MPD's access to Mr. Jackson's GPS tracking data violated his Fourth Amendment rights because he retained an undiminished expectation of privacy in that data with respect to the police.

**B. CSOSA Did Not Violate Mr. Jackson's Reasonable Expectation of Privacy by Sharing His GPS Data with the Police for Legitimate Compliance-Related Purposes.**

In concluding that the police violated Mr. Jackson's reasonable expectation of privacy in his GPS data, the motions judge relied on the Supreme Court's analysis in *Knights* of a warrantless search of a probationer's residence by the police. Because that search was independent of the probation department's exercise of supervision over the probationer, it was not justified by *Griffin*'s "special needs" rationale. The Supreme Court upheld the police search in *Knights* on a different rationale, one grounded on the "salient" fact that a condition of Mr. Knights's probation explicitly required him to submit to a search at any time, without cause, by either a probation officer *or a law enforcement officer*.[56] By virtue of his knowing acceptance of that search condition, the Court held, Mr.

---

[56] 534 U.S. at 118.

Knights's reasonable expectation of privacy as a probationer was so "significantly diminished" that the police constitutionally could search his home without a warrant based on "no more than reasonable suspicion" of criminal activity there.[57]

In the present case, the judge noted that Mr. Jackson's GPS contract with CSOSA contained "no clear and unambiguous search condition allowing MPD access." The conditions of Mr. Jackson's probation were "similarly devoid of any reference to the MPD." Consequently, the judge stated, Mr. Jackson's "reasonable expectation of privacy *as to the MPD* was not diminished" (emphasis added). On that premise, the judge proceeded to balance the intrusion of GPS monitoring on Mr. Jackson's entirely undiminished expectation of privacy in his movements against "the MPD's general interest in criminal investigation," inasmuch as "it was the MPD, and not CSOSA, who carried out the search in the course of investigating a crime." The judge concluded that "[b]ecause the MPD's search of

---

[57] *Id.* at 121. Although Mr. Knights's probation condition purported to authorize searches without any individualized suspicion at all, the Court found it unnecessary to address the constitutionality of a suspicionless search because the search in the case before it was supported by reasonable suspicion. *Id.* at 120 n.6. Later, in *Samson*, the Court held that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a *parolee* subject to a release condition explicitly authorizing such a search. 547 U.S. at 847. In arriving at that conclusion, the Court observed that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id.* at 850.

Jackson's GPS location information was neither based on any level of individualized suspicion[58] nor conducted pursuant to a clear and unambiguous search condition, Jackson's intact reasonable expectation of privacy as to the MPD outweighs the government's interest. . . .   The MPD search was therefore unreasonable under the Fourth Amendment."

We perceive several questionable features of this analysis.  For one thing, the judge's weighing does not seem to take into account the quite limited scope of the actual intrusion by the police on Mr. Jackson's privacy, nor the fact that once the police discovered he was at the scene of the robbery, they had ample individualized suspicion that he committed the robbery – points to which we shall return below.  For another thing, although the Supreme Court relied on the existence of an explicit search condition to uphold the search of a probationer's residence in *Knights*, it does not necessarily follow that (as the motions judge

---

[58]   The judge noted that the police "made no effort to determine whether there was a sufficiently high probability that Jackson committed the robbery" before turning to the GPS records of CSOSA's monitored supervisees "as a tool for criminal investigation."

appears to have reasoned) such an explicit condition is *always* necessary to diminish a probationer's reasonable expectation of privacy in his movements.[59]

Most important, we think the judge's analysis overlooks a critical distinction between *Knights* and the present case. Unlike in *Knights*, the intrusion on Mr. Jackson's expectation of privacy to acquire the incriminating evidence was performed, in the first instance, in the course of his probationary supervision. It was CSOSA, not the police, that attached the device and collected Mr. Jackson's GPS data for its own compliance-related purposes, in what we have concluded was a constitutional search; and (again, unlike in *Knights*) it was CSOSA's decision to grant the police access to that collected data. We therefore think the Fourth Amendment issue is properly framed differently from the way the motions judge framed it. The constitutional issue in our view is whether Mr. Jackson had an objectively reasonable expectation that CSOSA would not share his GPS data with the MPD. For the reasons that follow, we conclude that such an expectation would not have been reasonable.

---

[59] The judge drew the dubious conclusion that "it is not the individual's status as a probationer that diminishes his expectation of privacy. Rather, it is the search condition, permissible due to probationer status, that diminishes the individual's expectation of privacy." *But see Knights*, 534 U.S. at 119 ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." (quotation marks and citations omitted)).

CSOSA granted the MPD access to its supervisees' GPS monitoring data (and received access to the MPD's locational and temporal data pertaining to crimes, arrests, and other law enforcement activities) pursuant to a longstanding information-sharing agreement between the two agencies. Their Memorandum of Understanding (MOU), an exhibit in the proceedings below, explains that CSOSA and the MPD "share a common mission to reduce and prevent crime," and that a purpose of their two-way automated and routine data sharing arrangements is "to enhance CSOSA's ability to prevent supervised offenders from engaging in criminal activity, thereby reducing recidivism and improving public safety, in accord with the agency's mission." The MPD's detection of criminal activity by CSOSA's supervisees and enforcement of the law against them serves CSOSA's supervisory goals as well as the MPD's own law enforcement ends. To help achieve CSOSA's supervisory goals, the MPD's data-sharing commitments to CSOSA extend to providing electronic notification whenever one of CSOSA's supervised offenders is "matched to an MPDC arrest event," and in other ways enabling CSOSA personnel to determine whether information and intelligence in police databases "will affect an offender's supervision level or other aspects of CSOSA case management."

As CSOSA and the MPD agreed in the MOU, their data sharing is subject to their compliance with applicable District of Columbia and federal law governing the confidentiality of the information, specifically including (as pertinent here) the Privacy Act, 5 U.S.C. § 552a (2014).[60] Thus, the MOU provides that data-connectivity is contingent on CSOSA's publication of a "routine use" Privacy Act notice in the Federal Register stating that its records may be disseminated to law enforcement agencies "to assist in the general crime prevention and detection efforts of the recipient agency or to provide investigative leads to such agency." Accordingly, in 2006, CSOSA published a notice in the Federal Register stating it would treat as a routine use the disclosure of "electronic monitoring information," including "Global Positioning System (GPS) data," to the MPD and other law enforcement agencies that "require[] information relevant to a civil or criminal investigation to the extent necessary to accomplish their assigned duties unless

---

[60] The Privacy Act provides, in pertinent part, that "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except . . . with the prior written consent of[] the individual to whom the record pertains, *unless disclosure of the record would be . . . (3) for a routine use* as defined in subsection (a)(7) of this section and described under subsection (e)(4)(D) of this section." 5 U.S.C. § 552a(b) (emphasis added). The term "routine use" is defined to mean, "with respect to the disclosure of a record, the use of such record for a purpose which is compatible with the purpose for which it was collected." *Id.* § 552a(a)(7). Subsection (e)(4)(D) provides for agency publication in the Federal Register of "each routine use of the records contained in the system, including the categories of users and the purpose of such use."

prohibited by law or regulation" or "to assist in the general crime prevention and detention efforts of the recipient agency or to provide investigative leads to such agency."[61]

CSOSA made no secret of its sharing of GPS monitoring data with the police. As previously noted in Section II.A of this opinion, CSOSA publicized on its website the MPD's use of its GPS tracking data to "aid in suspect apprehension."

In view of CSOSA's established and publicly-declared practice of sharing its GPS tracking data with the MPD as a routine use permitted by the Privacy Act, it is difficult to see how Mr. Jackson could have expected otherwise. CSOSA was under no legal obligation to withhold its supervisees' GPS tracking data from the

---

[61] 71 Fed. Reg. 58, pp. 15177-78 (Mar. 27, 2006); *see also* 74 Fed. Reg. 158, pp. 41689-90 (Aug. 18, 2009). The release of parole supervision records to further a criminal investigation has been held to qualify as a routine use under the Privacy Act, *see United States v. Miller*, 643 F.2d 713, 715 (10th Cir. 1981), and it is not suggested that probation supervision records should be treated differently in this respect. We think it clear that CSOSA's disclosure of the GPS tracking data to the MPD and other law enforcement agencies is for purposes that are "compatible" with the purposes for which CSOSA collected that data. *Cf. Kimberlin v. United States Dep't of Justice*, 788 F.2d 434, 437-38 (7th Cir. 1986) (upholding disclosure of federal prison inmate's information to probation officer as a routine use under the Privacy Act, because "[a] probation officer is clearly a law enforcement official as the term is ordinarily used").

police. It did not tell Mr. Jackson it would do so; nor does he claim to have received such an assurance of confidentiality from the court or any other source. In point of fact, as far as we are aware, nothing in the record indicates Mr. Jackson actually was surprised to learn CSOSA had shared his GPS tracking data with the MPD. If anything, Mr. Jackson's dismayed remark to his CSO – that "he wouldn't be able to do anything" after the GPS device was attached to his ankle – suggests he foresaw the possibility.

In any event, an expectation on Mr. Jackson's part that CSOSA would not voluntarily share his GPS data with the police for their mutual, compliance-related purposes would have been objectively unreasonable. A primary objective of probationary supervision is "the protection of society from future criminal violations."[62] Cooperation with and enlistment of the police are means of accomplishing that objective. A probation officer is, as the Supreme Court has put it, "a peace officer, and as such is allied, to a greater or lesser extent, with his fellow peace officers."[63] An offender on probation "cannot pretend ignorance" of that fact, and "[a]bsent some express or implied promise to the contrary, he may

---

[62] *Washington v. United States*, 8 A.3d 1234, 1235 (D.C. 2010).

[63] *Fare v. Michael C.*, 442 U.S. 707, 720 (1979).

also be charged with knowledge that the probation officer is duty bound to report wrongdoing by the probationer when it comes to his attention, even if by communication from the probationer himself."[64]

The same principle applies to sharing evidence of a probationer's possible wrongdoing, including his whereabouts while under supervisory GPS tracking. As a general rule, courts have held that law enforcement agencies do not violate reasonable expectations of privacy or Fourth Amendment limitations by sharing evidence and information they have acquired in lawful searches and seizures with other law enforcement agencies for legitimate law enforcement purposes.[65] More to the point, it is well-settled that, because "the objectives and duties of probation officers and law enforcement personnel are often parallel and frequently intertwined[,] the law permits cooperation between probation officers and other law enforcement officials so that they may work together and share information to

---

[64] *Minnesota v. Murphy*, 465 U.S. 420, 432 (1984) (internal punctuation and citations omitted).

[65] *See, e.g.*, *United States v. Jenkins*, 496 F.2d 57, 73 (2d Cir. 1974) (approving of local police allowing federal agents to examine, for a bank robbery investigation, the serial numbers of dollar bills that the local police collected from the appellant at the time of his arrest on a gun charge); *United States v. Gargotto*, 476 F.2d 1009, 1014 (6th Cir. 1973) ("Evidence legally obtained by one police agency may be made available to other such agencies without a warrant, even for a use different from that for which it was originally taken.").

achieve their objectives."[66]   In *Griffin* the Supreme Court clearly implied, and other courts have held, that probation officers may share the lawfully-obtained fruits of probation searches with the police even if it would not have been lawful for the police to conduct the searches themselves.[67]

One of CSOSA's legitimate objectives is to detect the presence of its high-risk supervisees at the scenes of criminal activity by comparing their GPS tracking data with crime location data supplied by the MPD for that purpose. Individualized suspicion linking particular supervisees to particular crimes is not a precondition for CSOSA to conduct such narrowly targeted data searches; the point

---

[66] *Reyes*, 283 F.3d at 471; *see also United States v. McFarland*, 116 F.3d 316, 319 (8th Cir. 1997) (stating that "[p]arole and police officers may work together, . . . provided the parole officer is pursuing parole-related objectives"); *United States v. Martin*, 25 F.3d 293, 296 (6th Cir. 1994) ("[P]olice officers and probation officers can work together and share information to achieve their objectives.").

[67] *See, e.g.*, *Lambus*, 897 F.3d at 407, 409, 412 (approving state parole officer's sharing of GPS tracking information with federal law enforcement agents for a federal investigation because such cooperation was "rationally and reasonably related to" the parole officer's interest in preventing parolees "from engaging in new criminal activity"); *Newton*, 369 F.3d at 668 ("[I]n *United States v. Reyes*, 283 F.3d at 463-64, we approved coordinated activities between probation/parole officers and other law enforcement officials in furtherance of legitimate supervision objectives even though the specific conditions of supervision there at issue provided for residential intrusions only by a probation officer, with no mention of other law enforcement officials.").

of GPS monitoring is to discourage its supervisees from engaging in criminal activity and to discover whether grounds for suspicion exist. When the monitoring implicates a supervisee in criminal activity, nothing in the Fourth Amendment forbids CSOSA from reporting that information to law enforcement. Presumably, if Mr. Jackson's CSO had learned from his GPS tracking data before the police did that Mr. Jackson was present when Mr. Parker and Ms. Pleasant were robbed at gunpoint, the CSO would have so informed the police. None of that would have violated Mr. Jackson's reasonable expectations of privacy in his whereabouts.

What happened in this case is not materially different – CSOSA allowed the police to access its GPS tracking database to obtain directly the same limited information regarding its monitored supervisees' presence at crime locations that CSOSA could obtain and hand over to the police. We see no reason to question CSOSA's judgment that this furthered its legitimate supervisory objectives. As this very case illustrates, the police may be able to take appropriate law enforcement action more quickly, efficiently, and effectively than CSOSA can.

There is no evidence in this case that CSOSA's sharing of its GPS tracking data with the MPD exposes monitored supervisees to a materially greater intrusion on their privacy, or to a materially different use of the information gained. The

police did not use Mr. Jackson's GPS data to pry into his intimate or private affairs or the details of his personal life. They sought and obtained limited information and properly used it for law enforcement purposes. At the outset, the police sought to learn *only* whether any monitored supervisee was at the scene of the crime when it occurred. The police learned absolutely nothing about any supervisees who were not at the scene; their privacy was not invaded in any way. As for Mr. Jackson, the GPS data revealed only that he was at the crime scene – a public space in which he had no reasonable expectation of privacy. That information provided particularized suspicion (if not, indeed, probable cause) for the police to believe Mr. Jackson was one of the robbers, and ample justification for the police to track his public movements in the minutes immediately following the crime so that he would not escape or dispose of evidence.[68] Mr. Jackson did not possess a

---

[68] Although we do not think the police were obliged to apply for a search warrant in order to track Mr. Jackson's flight after they discovered he was present at the scene of the robbery, we note that the existence at that point of exigent circumstances provided an alternative justification for proceeding without a warrant. *See Carpenter*, 138 S. Ct. at 2223-24 (explaining that although the government will "generally" need a warrant to access cell-site location information comparable to GPS data, the exigencies of the situation may render it objectively reasonable to collect the information without a warrant; "[s]uch exigencies include the need to pursue a fleeing suspect, . . . or prevent the imminent destruction of evidence").

reasonable expectation that those movements would be private.[69] The police use of his GPS data did not extend beyond that tracking. While long-term GPS tracking impinges significantly on a person's expectation of privacy in his movements, there was nothing long-term about the police tracking of Mr. Jackson; it was as brief as it could possibly have been. Although the police learned that Mr. Jackson fled into an apartment (it is unclear whether they knew or had reason to believe it was Mr. Jackson's residence), the tracking disclosed nothing about his activities inside it. In short, any intrusion by the police on Mr. Jackson's reasonable expectation of privacy was *de minimis*, in our view, and far outweighed by its public benefits. Mr. Jackson has no grounds to complain that the police, by resorting to his GPS data in the immediate aftermath of the armed robbery, were able to arrest him more swiftly and recover corroborative physical evidence that otherwise might have been lost. If that was so, it only underscores the reasonableness of CSOSA's sharing of the data with the police.

Mr. Jackson argues that CSOSA's sharing of its GPS tracking data with the police for use in law enforcement is at odds with the Supreme Court's decision in

---

[69] *See United States v. Knotts*, 460 U.S. 276, 281 (1983) ("A person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.").

*Ferguson v. Charleston.*[70]  We do not agree.  In *Ferguson*, the Court held that a public hospital violated its patients' Fourth Amendment rights if, in testing them for illegal drug use as part of their medical care, the hospital did so with the undisclosed objective of obtaining incriminating evidence and sharing it with law enforcement for purposes of prosecuting the patients.  That case is not comparable to this one.  The persons subject to the searches in *Ferguson* were "typical" hospital patients with typical, undiminished privacy expectations.  The Court recognized that they reasonably expected the hospital would not voluntarily share their personal and private medical test results with outsiders for a non-medical use such as criminal prosecution unless the hospital had their informed consent to do so.[71]  In contrast, CSOSA's supervisees are convicted probationers with significantly diminished expectations of privacy in their activities; they are aware CSOSA collects their GPS tracking data with a law enforcement objective; and having that awareness, they cannot reasonably expect CSOSA to withhold the GPS

---

[70]  532 U.S. 67 (2001).

[71]  *Id.* at 78.  Not insignificantly, however, the Court distinguished circumstances in which state hospital employees are legally obligated to report evidence of criminal conduct acquired in the course of providing medical care.  The Court noted that the existence of reporting laws might bear on the patients' reasonable expectations of privacy in their personal information.  *Id.* at 78 n.13, 80-81

data from other agencies that share CSOSA's objective and will utilize the data to further it.

We conclude that CSOSA did not violate Mr. Jackson's reasonable expectation of privacy by granting the police access to his GPS tracking data in furtherance of their mutual law enforcement objectives. The limited police utilization of that access comported with the reason CSOSA granted it and did not unreasonably intrude on Mr. Jackson's privacy. We therefore conclude that Mr. Jackson's Fourth Amendment rights were not violated.

We emphasize that we have considered in this opinion only whether the police violated Mr. Jackson's Fourth Amendment rights by the limited inspection and use they actually made of his GPS tracking data. We uphold a narrowly tailored resort by the police to the GPS data in the absence of articulable suspicion – the same check to determine whether a monitored probationer was at the scene of the crime when it occurred that CSOSA itself routinely and permissibly performs, likewise without articulable suspicion. In doing so, we recognize the sensitivity of GPS tracking information and do not dismiss privacy concerns about its susceptibility to possible abuse by overzealous investigators. But no abuse is revealed by the record before us in this case and, particularly when the question is

a constitutional one, "[c]ourts should not decide more than the occasion demands."[72] We therefore refrain from discussing whether the police hypothetically would violate the Fourth Amendment if they were to explore CSOSA's GPS data more extensively or without the valid law enforcement purpose present in this case.

## III.

For the foregoing reasons, we reverse the order of the Superior Court granting Mr. Jackson's motion to suppress electronic and tangible evidence and remand for further proceedings.

---

[72] *District of Columbia v. WICAL Ltd. P'ship*, 630 A.2d 174, 182 (D.C. 1993) (quotation marks and citation omitted).